UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM A. DEPARDO,

          Plaintiff,

v.

MFS/SUN LIFE FINANCIAL
DISTRIBUTORS, INC. d/b/a
SUN LIFE OF CANADA and
TAC WORLDWIDE COMPANIES,

          Defendants.

Civil Action No. 04-10248-DPW

**DEFENDANT TAC WORLDWIDE COMPANIES'**
**STATEMENT OF MATERIAL FACTS**

      Pursuant to Local Rule 56.1, Defendant TAC Worldwide Companies ("TAC") hereby states the following material facts. Based on the nature of this case, which involves judicial review of the information available to TAC and Defendant MFS/Sun Life Financial Distributors, Inc., d/b/a Sun Life of Canada ("Sun Life"), when making their determinations regarding Plaintiff's claims for benefits under TAC's employee welfare benefit plan (the "Plan"), the material facts for purposes of summary judgment are contained in the claim file, the Plan documents, and additional documents agreed to by the parties (collectively, the "Administrative Record"). This statement is not meant to summarize every fact set forth in the Administrative Record; instead, this statement sets forth those facts upon which TAC principally relies in its memorandum of law in support of summary judgment. Defendant Sun Life previously has filed with the Court the Administrative Record. References to "AR at 0###" herein refer to numbered pages in the Administrative Record.

**Background Information**

1.      Plaintiff William A. DePardo ("Plaintiff" or "Mr. DePardo") was working for TAC in the position of Vice President/Corporate Project Management in the Company's Systems Management and Development business unit as of December, 2001.  (AR at 0332, 0822.)

2.      On or about December 17, 2001, Mr. DePardo informed the Company that he was going out on leave as a result of coronary artery disease.  (AR at 0333-0335, 0802, 0823.)

3.      TAC notified Plaintiff by letter dated April 5, 2002, that it had terminated Plaintiff's employment effective on April 5, 2002.  (AR at 0806.)

**TAC's LTD and Life Insurance Policy With Sun Life**

4.      Sun Life insures and administers claims for Long Term Disability ("LTD") and life insurance benefits under the Plan, and is responsible for determining, in its discretion, a participant's eligibility for benefits.  (AR at 0051-0052; see also Sun Life Assurance Company of Canada's Answer to Plaintiff's Am. Complaint at ¶ 4, 5.)

5.      A true copy of the Policy for Basic Life, Basic Accidental Death and Dismemberment, Optional Life, Optional Accidental Death and Dismemberment, Dependent Life and Long Term Disability Insurance (the "LTD and Life Insurance Policy") that was in effect beginning on January 1, 2000, and that applies to Plaintiff's claims, is included in the Administrative Record.  (AR at 0052.)

6.      Sun Life is solely responsible for paying benefits in accordance with all provisions provided by the LTD and Life Insurance Policy.  (AR at 0003.)

7.      If Sun Life receives notice and proof of claim that an employee has died while insured, Sun Life will pay the amount of life insurance in force on the employee's date of death.  (AR at 0022.)

8.      If Sun Life receives notice and proof of claim that an employee is totally or partially disabled, Sun Life will pay a net monthly LTD benefit.  (AR at 0034.)

9.      Sun Life will terminate LTD benefits on the date Sun Life determines the employee is able to perform on a full-time basis all of the material and substantial duties of his own occupation.  (AR at 0039.)

10.     Prior to paying any claim under the policy, Sun Life requires proof of claim and that proof must be satisfactory to Sun Life.  (AR at 0052.)

11.     When Sun Life receives satisfactory proof of claim, benefits payable under the policy are paid for any period for which Sun Life is liable. (AR at 0052.)

12.     The Summary Plan Description ("SPD") for the LTD and Life Insurance Policy states: "Proof [of claims] must be satisfactory to Sun Life . . . Benefits are payable when Sun Life receives satisfactory Proof of Claim."  (AR at 0740.)

### Conversion of Group Life Insurance Coverage Under the Policy

13.     An employee may convert his group life insurance coverage to an individual policy by submitting a written application to Sun Life and by paying the first premium within the 31-day period following the date the insurance ceases or reduces.  (AR at 0026.)

14.     During his employment, Plaintiff was given a copy of the LTD and Life Insurance Policy SPD, which states with regard to life insurance conversion:

> How do I convert my life insurance?  You convert by applying to Sun Life for an individual policy along with sending payment of the first premium within 31 days after any part of your Life Insurance ceases or reduces.  This is your 31 day conversion period.  (AR at 0714.)

15.     Sun Life sent Plaintiff a letter dated April 1, 2002, in which Sun Life informed Plaintiff as follows:

> According to our records . . .   You ceased active employment due to illness on December 17, 2001.  Since you were over age 60 on that date, you do not meet the Group Policy requirements for [waiver of policy premium].  Your employer has the option of continuing your coverage, for absence due to illness, by payment of premium for up to 12 months from the date you ceased active employment, while this Group Policy is in force.  If they terminate your coverage, you have 31 days to convert to an individual policy, without medical examination.  Your employer will have all of the necessary paperwork in the event that occurs.  (AR at 0268.)

16.     Following the April 5, 2002 termination of Plaintiff's employment, TAC sent Plaintiff a letter dated April 11, 2002 and enclosed a notice concerning his group life insurance conversion rights.  This notice stated:

> Information regarding your Benefits . . . Your life insurance ends on the date your employment terminates; however, you may be eligible to convert your group life insurance coverage, provided through Sun Life of Canada, to an individual policy.  Because rates are updated periodically, please call 1-800-247-6875 to verify the rates currently in effect.  You must apply for conversion and pay the required premium within 31 days following termination of your insurance.  (AR at 0812.)

3

17.     By letter dated May 14, 2002 Plaintiff's counsel wrote to Sun Life that Mr. DePardo had not received notification from TAC as to whether his life insurance had been terminated or whether it had been continued for some period of time. (AR at 0773.)

18.     In response to this letter, Sun Life wrote Plaintiff's counsel a letter dated May 20, 2002, in which Sun Life stated that Mr. DePardo could submit his application for conversion coverage by June 20, 2002 in the event his coverage had been previously terminated, and Sun Life enclosed a conversion package. (AR at 0235.)

### TAC's STD Plan And Plaintiff's Claim for STD Benefits

19.     TAC self-insures with regard to STD benefits under the Plan. (AR at 0814, 0821.)

20.     TAC's STD plan provides:

> You will receive 66 2/3% of your weekly salary (an average of your base salary plus commission) for up to a total of 13 weeks you need to be out of work. Your disability must be approved by a doctor and then approved through our insurance carrier before payment will begin. (AR at 0821.)

21.     Pursuant to the Service Agreement between TAC and Sun Life for the STD plan (the "Service Agreement"), in connection with the operation of the STD plan, Sun Life furnishes medical review and duration recommendations to TAC for STD claims. (AR at 0814.)

22.     Pursuant to the Service Agreement, Sun Life advises TAC as to the disposition of each claim. (AR at 0815.)

23.     After he ceased working on December 14, 2001, Plaintiff applied to TAC for STD benefits. (AR at 0332-0336.)

24.     On February 13, 2002, Sun Life advised TAC that Plaintiff's claim for STD benefits should be approved with the period of approved disability beginning on December 17, 2001 and continuing through the policy maximum thirteen weeks of benefits. (AR at 0329.)

25.     Following Sun Life's recommendation, TAC approved Plaintiff's claim for STD benefits for the maximum period under the STD plan and paid STD benefits to Plaintiff for that period. (See Plaintiff's Am. Complaint at ¶ 23.)

26.     At the time he became disabled on or about December 17, 2001, Plaintiff was receiving from TAC base salary at the weekly rate of $1,634. He was not receiving any commissions or bonuses at that time. (AR at 0280, 0283, 0332, 0821.)

27.     In calculating the amount of Plaintiff's weekly STD benefit, TAC used only Plaintiff's weekly base salary in the amount of $1,634. (AR at 0280, 0283, 0332, 0759.)

28.     In 2001, Plaintiff was receiving an annual salary of $85,000.  For a period of time ending in November, 2001, he also received a discretionary performance bonus in the amount of $12,000 per month, approved on a month-to-month basis by the Company's former President, Michael Iandoli.  Each month, Mr. DePardo would submit a check request to Mr. Iandoli for $12,000 and, upon approval by Mr. Iandoli, he would be paid the requested amount.  In October, 2001, Mr. Iandoli left the Company, and Salvatore Balsamo thereafter took over as interim President.  On or before November 15, 2001, Mr. DePardo approached Mr. Balsamo and asked him to sign a $12,000 check request for an extra payment for the month of October.  Mr. Balsamo said he had no knowledge of any such extra payments.  He agreed to sign the October check request, but stated that it would be the last one, and that going forward Mr. DePardo would be paid only his base salary, not any extra month-to-month payments.  This conversation took place on or before November 15, 2001.  (AR at 0822-23.)

29.     Plaintiff's payroll records reflect that, prior to November, 2001, he received payments of "bonus" amounts; these records do not reflect the payment of any "commissions" to DePardo from TAC.  (AR at 0297, 0299, 0302, 0304, 0332, 0610.)

30.     In connection with Mr. DePardo's claim for LTD benefits, Sun Life reviewed Plaintiff's assertion that the bonuses he had been paid were really commissions that should have been included in the calculation of his LTD benefit and concluded as follows:

> Pursuant to your request, we have reviewed the salary information used in calculating Mr. DePardo's benefits issued to him for the period of March 15, 2002 to July 14, 2002 . . . .  With regards to Mr. DePardo's compensation, please find attached a letter from his employer, TAC Worldwide, authored by Robert P. Moritz, Director of Human Resources.  In this letter, Mr. Moritz indicates that Mr. DePardo's compensation consists only of a weekly salary of $1,634 . . . .  In your September 12, 2002 letter, you indicate that Mr. DePardo's total year to date income was $227,865.62 and you supplied a copy of his pay stub.  You further quote the definition of earnings under the [LTD] policy, supplying a copy of the booklet page.  To reiterate, the definition of monthly earnings states, 'Your basic monthly earnings as reported by your Employer immediately before the first date your Total or Partial Disability begins.  Total Monthly Earnings does include commissions, but does not include bonuses, overtime pay or any other extra compensation . . . .'  Based upon the definition, as stated above, commissions are included, however bonuses are not.  You maintain that Mr. DePardo received $12,000.00 commission per month.  However, upon review of the pay stub submitted to document his earnings, Mr. DePardo does not receive commissions, rather, his pay stub documents that he receives an executive bonus.  This information along with his employer's confirmation regarding his salary, verifies to Sun Life that we have correctly calculated his monthly earnings and subsequent monthly

5

benefit by using the reported income of $1,634.62 per week . . . . With regard to the calculation of his benefits and as supported by the contractual definition of monthly earnings, the documentation provided, and his employer's verification of earnings, we maintain that the [LTD benefit] amount . . . is correct and will remain unchanged.  (AR at 0587.)

        Respectfully submitted,

        TAC WORLDWIDE COMPANIES

        By its attorneys,

        /s/ Robert M. Shea
        Robert M. Shea, BBO # 556356
        Scott J. Connolly, BBO # 651007
        MORSE, BARNES-BROWN
        & PENDLETON, P.C.
        Reservoir Place
        1601 Trapelo Road
        Waltham, MA 02451
        (781) 622-5930

Dated: October 14, 2004

## CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the above document was served upon the attorney of record for each party by first class mail on October 14, 2004

        /s/ Robert M. Shea
        Robert M. Shea