UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM A. DEPARDO,<br>        Plaintiff<br><br>V.<br><br>MFS/SUN LIFE FINANCIAL<br>DISTRIBUTORS, INC. d/b/a SUN LIFE OF<br>CANADA and TAC WORLDWIDE<br>COMPANIES,<br>        Defendants | CIVIL ACTION NO. 04-10248-DPW |

## MEMORANDUM IN SUPPORT OF SUN LIFE OF CANADA'S MOTION FOR SUMMARY JUDGMENT

### NATURE AND STATUS OF PROCEEDINGS

In this case plaintiff William DePardo, seeks to recover payment of short-term and long-term disability benefits, as well as life insurance benefits, under an employee benefit plan (the "Plan") provided by his employer, TAC Worldwide Companies ("TAC"), and funded by a group insurance policy (the "Policy") issued by Sun Life Assurance Company of Canada ("Sun Life"). Both parties agree this case is governed by ERISA, 29 U.S.C. §1001 et. seq. (see Complaint ¶1).

Mr. DePardo claims that Sun Life (1) improperly denied his claim for total disability benefits after August 11, 2002 (Complaint ¶21); (2) improperly calculated the amount of his total disability benefit for the period December 17, 2001 through August 11, 2002 (Complaint ¶¶24 & 26); and (3) wrongfully withheld the accelerated life insurance benefit available under the Plan. (Complaint ¶¶30-33). Sun Life contends that the decisions it made on Mr. DePardo's benefit claim were reasonable and supported by the substantial evidence in the Administrative Record.

On December 26, 2001, Mr. DePardo filed a claim for short-term disability ("STD") due to coronary disease. At the time he submitted his claim, TAC employed Mr. DePardo in a sedentary position as its Vice President of Corporate Projects Management. Sun Life recommended that TAC approve his leave and pay Mr. DePardo short-term disability benefits.

In February 2002, Mr. DePardo filed a claim for long-term disability ("LTD") benefits. Although Sun Life initially denied the claim, on appeal Mr. DePardo submitted additional medical information that established that he had coronary artery by-pass surgery in April 2002. Sun Life determined that the additional medical information supported restrictions and limitations due to coronary disease from December 17, 2001 to July 14, 2002. To ensure that it had a full understanding of Mr. DePardo's medical condition, Sun Life permitted Mr. DePardo to submit additional records, which led to Sun Life extending his benefits to August 11, 2002 (i.e., one month). As is required by the Plan, Sun Life paid benefits during these periods based on the salary information it received from Mr. DePardo's employer.

Because Sun Life's medical evaluations determined that after August 11, 2002, Mr. DePardo's cardiac condition would not preclude him from performing all of the material and substantial duties of his sedentary occupation, Sun Life notified Mr. DePardo that he did not qualify for long-term disability benefits after August 11, 2002. Having exhausted his administrative remedies, Mr. DePardo filed this lawsuit. However, at no time during the administrative process did Mr. DePardo submit a claim under the Plan's accelerated life insurance provision.

The parties have filed an agreed upon Administrative Record with the Court. Because a review of the Administrative Record reveals that Sun Life's decision on Mr. DePardo's claim for benefits, and it's calculation of the amount of the benefits paid, was not arbitrary or capricious,

Sun Life has moved for summary judgment.[1]  Sun Life submits this Memorandum, the Statement of Undisputed Facts, and the Administrative Record ("AR") in support of its Motion for Summary Judgment.

<u>**STATEMENT OF UNDISPUTED FACTS**</u>

Sun Life incorporates by this reference its Statement of Undisputed Facts prepared pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 and filed contemporaneously with this memorandum.

<u>**ARGUMENT**</u>

I.    **STANDARD OF REVIEW.**

A.    <u>The Plan Grants Sun Life Discretionary Authority.</u>

The arbitrary and capricious standard of review applies to Sun Life's decision on Mr. DePardo's claim under the Plan.  "The Supreme Court has held that a denial of benefits under 29 U.S.C. §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan.'" <u>Guarino v. Metropolitan Life Ins. Co.</u>, 915 F. Supp. 435, 443 (D. Mass. 1995), *quoting* <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 114 (1989) (emphasis supplied). The question, therefore, is whether the Plan grants Sun Life discretionary authority.

An ERISA plan need not contain the words "discretion" or employ certain "magic words" or a particular linguistic template in order to endow an administrator with discretionary authority. <u>Wildbur v. Arco Chemical Co.</u>, 974 F.2d 631, 637 (5th Cir. 1992) (no "magic words" required to

---

[1]    In a non-jury case, where the case is to be decided on summary judgment motions on an agreed record, the case is deemed to be submitted as stated.  <u>See</u> <u>Garcia-Ayala v. Lederle Parenterals, Inc.</u>, 212 F. 3d 638, 643-644 (1st Cir. 2000).  As a result, instead of drawing inferences in favor of each nonmoving party, as would ordinarily be done in considering cross-motions for summary judgment, the Court must determine the appropriate inferences to be drawn from the factual record.  <u>Id.</u>

trigger deferential standard of review); <u>Kiley v. Travelers Indemnity Co. of Rhode Island</u>, 853 F.

Supp. 6, 10 (D. Mass. 1994); <u>McLain v. Metropolitan Life Ins. Co.</u>, 820 F. Supp. 169, 174 (D.

N.J. 1993).  Instead, it need only appear on the face of the Plan documents that the fiduciary has

been "given the power to construe disputed or doubtful terms" or to resolve disputes over

benefits eligibility.  <u>Rodriguez-Abreu v. Chase Manhattan Bank</u>, 986 F.2d 580, 583 (1st Cir.

1993).

 The Plan provides Sun Life with the discretionary authority to determine benefit

eligibility.  Specifically, the Plan provides that in order to receive long-term disability benefits

proof of claim must be given to Sun Life.  The Plan further provides that "proof must be

satisfactory to Sun Life." (AR-0685).  Although the First Circuit has not specifically addressed

whether this language is sufficient to convey the requisite discretion to Sun Life, in <u>Brigham v.

Sun Life of</u> Canada, 317 F.3d 72, 82 (1st Cir. 2003), the First Circuit indicated that, if called upon

to do so, it would follow the "widespread acceptance of the view that [this language] triggers

discretionary review."

 The District Courts in Massachusetts have held that plan language requiring that evidence

of proof be "satisfactory to us" conveys the requisite discretionary authority to warrant review of

a benefits decision under an arbitrary and capricious standard.  *See* <u>Brigham v. Sun Life of

Canada</u>, 183 F. Supp. 2d 427, 435 (D. Mass. 2002)(the phrase "satisfactory to us" clearly grants

to Sun Life discretionary authority over eligibility decisions.) <u>Metropolitan Life Ins. Co. v.

Socia</u>, 16 F. Supp. 2d 66, 69 (D. Mass. 1998)("all proof must be satisfactory to us" sufficient to

convey discretionary authority.); <u>Miller v. Wang Laboratories, Inc.</u>, 998 F. Supp. 78, 80 (D.

Mass. 1998)(Plain language requiring that proof of claim be "satisfactory to us" conferred

necessary discretion to require that the Court review the denial of benefits under the arbitrary and

capricious standard); <u>Guarino v. Metropolitan Life Ins. Co.</u>, 915 F. Supp. 435, 444 (D. Mass. 1995)(Plain language requiring that "all proof of claim must be satisfactory to the Insurance Company" granted sufficient discretionary authority to warrant the arbitrary and capricious standard of review).

The Plan gives Sun Life sufficient discretionary authority to warrant application of the arbitrary and capricious standard of review.

B.    Sun Life's Decision To Deny Benefits Must Be Upheld
       Unless It Is Found To Be Arbitrary and Capricious.

Under the arbitrary and capricious standard of review, Sun Life's decision to deny benefits must be upheld if it "is reasoned and supported by substantial evidence in the record". <u>Vlass v. Raytheon Employees Disability Trust</u>, 244 F.3d 27, 29-30 (1st Cir. 2001) quoting <u>Associated Fisheries of Maine, Inc. v. Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997).  A decision is supported by "substantial evidence" when the evidence is reasonably sufficient to support the conclusion.  <u>Doyle v. Paul Revere Life Ins. Co.</u>, 144 F.3d 181, 184 (1st Cir. 1998).  Thus, the decision will be reversed only if the "eligibility determination was unreasonable in light of the information available to" Sun Life.  <u>Cook v. Liberty Life Assurance Co.</u>, 320 F. 3d 11, 19 (1st Cir. 2003).

## II.    MR. DEPARDO CANNOT PREVAIL ON HIS LONG-TERM DISABILITY CLAIM.

To prevail on his long-term total disability claim, Mr. DePardo must demonstrate, based on the evidence in the Administrative Record, that: (1) that Sun Life's decision that he was not totally disabled as defined by the Plan after August 11, 2002 was arbitrary and capricious, and (2) because of a sickness he remained "unable to perform all of the material and substantial duties of his own occupation" after August 11, 2002.  The burden of proof is on Mr. DePardo.

See <u>Brigham</u>, 317 F.3d at 84-85, <u>Terry v. Bayer</u>, 145 F.3d 28, 34 (1st Cir. 1998). Mr. DePardo

cannot clear either of these hurdles.

> A.    Sun Life's Decision To Pay Total Disability Benefits Up To
>        August 11, 2002 Was Reasonable And Supported By Substantial
>        <u>Evidence In The Administrative Record.</u>

Plaintiff claims that Sun Life's determination that Mr. DePardo was not totally disabled

after August 11, 2002 is arbitrary and capricious. To the contrary, Sun Life's decision was

reasonable and supported by substantial evidence in the Administrative Record, which

established that 1) Mr. DePardo worked in a sedentary occupation, which permitted him to sit

throughout the work day; 2) medical records from Dr. Guiney's July 16, 2002 office visit show

that Mr. DePardo was walking 20 minutes a day, had no angina, no ischemia, no dyspena and

appeared to be stable but not fully recovered; 3) Sun Life's medical evaluation determined that

Mr. DePardo could be expected to return to his sedentary occupation within 2 to 4 weeks of the

July 16, 2002 evaluation; 4) a May 2003 stress test showed a normal exercise tolerance equal to

6 mets despite a reduced ejection fraction; 5) Sun Life's medical evaluation revealed that with an

exercise tolerance of 6 mets Mr. DePardo could perform his sedentary occupation despite the

reduced ejection fraction, and; 6) Mr. DePardo's treating physician did not explain why he

believed Mr. DePardo could not return to a sedentary occupation when Mr. DePardo per the July

16, 2002 office visit could walk for 20 minutes and per the May 2003 stress test had a normal

exercise tolerance.

When Mr. DePardo submitted his LTD claim in 2002 he was employed by TAC as Vice

President of Corporate Project Management. In the Employer's Statement TAC identified the

physical requirements of Mr. DePardo's occupation. TAC informed Sun Life that as Vice

President of Corporate Project Management, Mr. DePardo was required to sit 6-8 hours a day,

stand or walk 0-2 hours per day, and drive 0-2 hours per day. (AR-0290). Occasionally he had to

bend or reach above shoulder level. He could change positions at will. He was never required to lift, climb, kneel, balance, push/pull, or crawl/crouch. (AR-0290). The Dictionary of Occupational Titles (DOT) published by the Department of Labor, defines sedentary work as "exerting 10 pounds of force occasionally. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." (AR-0618). Based on this definition and the job description provided by TAC, Sun Life reasonably concluded that Mr. DePardo's occupation was a sedentary position. (AR-0618).

Upon receipt and evaluation of Mr. DePardo's LTD claim Sun Life initially determined that no benefits were payable because the medical evidence did not establish that Mr. DePardo had stopped working due to an Injury or Sickness. Based on the medical records received it appeared that Mr. DePardo had been able to work in his sedentary occupation despite his coronary disease, and there was no evidence of a change or complication in his medical condition that would have prevented him from returning to work in his occupation. (AR-0286).

Mr. DePardo appealed Sun Life's denial of his benefits and submitted additional medical records. The new medical information revealed that Mr. DePardo had a coronary artery by-pass graft surgery in April 2002. Sun Life, as part of the claim review process, asked a cardiothoracic surgeon, Dr. Watson to evaluate the medical evidence submitted. Dr. Watson determined that the April 2002 surgery was successful. Mr. DePardo "should be expected to return to normal activity levels, subject to any post operative complications…It appears the angina pectoris has been ameliorated and should no longer be a cause of disability from his previous occupation." (AR-0638, 0639). Dr. Watson opined that it would be reasonable to assume that Mr. DePardo would be unable to perform the duties of his sedentary occupation from December 15, 2001 to April 30,

2002 the date of his surgery and then 8-10 weeks thereafter. (AR-0639).  In light of Dr. Watson's medical evaluation, Sun Life reasonably reopened the claim and paid Mr. DePardo LTD benefits from December 17, 2001 (the end of STD benefits) through April 30, 2002 (the date of his surgery) and then through July 14, 2002 (another 10 weeks for post operative recovery). (AR-0624).  Sun Life informed Mr. DePardo that based on the information provided there was no support for a continuing disability after July 14, 2002 from his sedentary occupation as Vice President of Corporate Project Management. (AR-0626).

Mr. DePardo again disagreed with Sun Life's decision. (AR-0614).  Although the administrative record had been closed, and under obligation to do so, Sun Life agreed to review additional medical records that Mr. DePardo believed supported his claim for total disability after July 14, 2002.  Mr. DePardo submitted current records from his cardiologist, and an opinion letter from his retired, former primary care physician, Dr. John Niceforo, who had not seen Mr. DePardo as a patient since April 2001. (AR-0571, 0572).  These records along with the entire file were then reviewed by not one, but three specialists: Dr. Marc Friedman, board certified in internal medicine and cardiovascular disease; Dr. Richard Herman, a family practitioner; and Dr. Paul W. Sweeney, a board certified cardiologist.

Dr. Friedman agreed with Dr. Watson that most patients are fully recovered from their coronary artery by-pass graft by 10 weeks post-surgery, but that based on the records of Dr. Guiney, Mr. DePardo may be recovering more slowly. (AR-0447). Dr. Friedman recommended that Mr. DePardo undergo a cardiac Independent Medical Examination ("IME"), including a stress test to determine his physical limitations. (AR-0447).

Sun Life scheduled a cardiac IME and stress test, as is its right under the Policy, in order to ensure that it had a full understanding of Mr. DePardo's medical condition. (AR-0429).  Sun

Life notified Mr. DePardo that no LTD benefits will be payable for any period he fails to submit to a medical examination. (AR-0430, 0039).

Nevertheless, Mr. DePardo refused to undergo the cardiac IME.  He agreed to have a stress test, but only if it was administered by his cardiologist. (AR-0427).  In a further effort to accommodate Mr. DePardo, Sun Life agreed to cancel the IME and allow Dr. Guiney to administer the stress test. (AR-0427).

Mr. DePardo underwent a stress test on May 1, 2003 and sent the results, along with another letter from Dr. Guiney, to Sun Life. The stress test concluded that Mr. DePardo "has normal exercise capacity (METS achieved = 6)…There is no evidence of ischemia…The calculated [ejection fraction] is 24% with hypokinesis." (AR-0421, 0422). In his letter, Dr. Guiney reiterated his opinion that he considered Mr. DePardo "totally and permanently disabled by virtue of his heart disease," and that "by any reasonable standard a man with an ejection fraction of 24 per cent, diabetes mellitus and hypertension cannot possibly do any of the jobs for which he in the past had training or experience." (AR-0420).

On June 3, 2003 Mr. DePardo's medical records, including the newly submitted stress test and letter from Dr. Guiney were reviewed by family practitioner Dr. Richard Herman. Dr. Herman recommended that Dr. Paul Sweeney, a cardiologist, review the medical information in order to assist with the determination of whether a man who can perform at a level of 6 mets on a stress test but has an ejection fraction of 24% would have the capacity to sustain work in a sedentary occupation. (AR-0398).

Following Dr. Herman's recommendations, Sun Life referred the file to Dr. Sweeney, to render an opinion as to whether Mr. DePardo's 24% ejection fraction would preclude him from performing his sedentary occupation.  Dr. Sweeney concluded that with an ejection fraction of

24%, Mr. DePardo is "certainly capable from a cardiac viewpoint, of performing the duties outlined in his job description." (AR-0388). Dr. Sweeney noted that while Mr. DePardo recovered slowly, based on his progress to date, Mr. DePardo could have returned to work at a sedentary level within 2 to 4 weeks of his July 16, 2002 visit with Dr. Guiney. Dr. Sweeney observed that the May 1, 2003 stress test documents no evidence of ischemia. The exercise duration reported on the stress test corresponds to a workload of "6 mets." Dr. Sweeney stated that "sedentary work (like Mr. DePardo's) generally requires 3 or less mets, light carpentry and auto repair or stocking light objects on shelves 3 to 5 mets, and activities such as shoveling dirt, exterior carpentry and sawing wood require 5 to 7 mets." (AR-0389). "The physical requirements of Mr. DePardo's job description do not exceed the exercise capacity demonstrated during the May 1, 2003 stress test." Based on these facts, Dr. Sweeney opined that there was no cardiac basis to support disability. (AR-0389).

Sun Life reasonably approved an additional 4 weeks of benefits through August 11, 2002 based on Dr. Sweeney's opinion that Mr. DePardo could have returned to work within 2 to 4 weeks of the July 16, 2002 office visit with Dr. Guiney. (AR-0385). Given the results of the May 1, 2003 stress test and the opinions of the reviewing physicians, Sun Life reasonably concluded that Mr. DePardo had the ability to perform his sedentary occupation after August 11, 2002. (AR-0386).

Sun Life's decision that Mr. DePardo could return to work in his sedentary occupation as of August 11, 2002 is supported by substantial evidence in the administrative record. During the claim and appeal process, Mr. DePardo was provided with 3 separate opportunities to submit additional medical information. Sun Life sought the opinions of 4 medical specialists. Sun Life requested an IME (which Mr. DePardo refused to attend) and conducted an additional stress test.

In other words, Sun Life's decision was "reasonable in light of the information available to it." Cook v. Liberty Life Assurance Company of Boston, 320 F.3d 11, 19 (1st Cir. 2003).

In its evaluation of Mr. DePardo's claim for continued benefits after July 14, 2002, Sun Life's medical consultants, Dr. Hermann and Dr. Sweeney, addressed what Dr. Guiney suggested was the key medical issue in this claim: whether Mr. DePardo, who can perform at a level of 6 mets on a stress test but has an ejection fraction of 24%, has the capacity to sustain work in a sedentary occupation. (AR-0398). To reach its decision that Mr. DePardo could return to his sedentary occupation as of August 11, 2002, Sun Life weighed the opinions of its medical consultant, cardiologist Dr. Sweeney, with the opinion of Mr. DePardo's treating cardiologist, Dr. Guiney.

Despite Dr. Guiney's opinion that DePardo remained totally disabled, his medical records reveal that as of July 16, 2002, Mr. DePardo was walking "20 minutes a day;" "his dyspena is no longer present," there "does not appear to be any angina pectoris;" "he looked well but he is too fat;" "he is doing better but not completely back to normal." (AR-0576, 0577). And, although Dr. Guiney opined that the May 2003 stress test revealed poor exercise tolerance, the stress test reported "the patient has a normal exercise capacity (mets allowed = 6)." Nowhere does Dr. Guiney explain why on the one hand he says Mr. DePardo cannot perform any occupation, but on the other hand his records and medical tests reveal that by July 2002 Mr. DePardo is walking 20 minutes a day and his most recent stress test reports a normal exercise tolerance. Nor does Dr. Guiney explain why, if Mr. DePardo according to his stress test can exercise to a level of 6 mets (i.e., the equivalent of shoveling dirt or exterior carpentry), he cannot perform his sedentary occupation which requires "sitting" 6 to 8 hours a day.

On the other hand, Sun Life's medical consultant, Dr. Sweeney, states that Mr. DePardo's occupation, which qualifies as sedentary work, requires "3 mets or less." Based on the information provided by Dr. Sweeney, despite his reduced ejection fraction, the physical requirements of Mr. DePardo's occupation do not exceed the exercise capacity demonstrated during the stress test of May 1, 2003. Plus, Dr. Sweeney points to the results of Dr. Guiney's July 16, 2002 office visit which reflect that Mr. DePardo was stable, improved, but not yet back to normal. Based on the findings made during this visit, Dr. Sweeney's opinion that Mr. DePardo would be expected to return to a sedentary occupation in 2-4 weeks of the July 16, 2002 office visit is reasonable. Accordingly, Sun Life reasonably weighed the opinions of the physicians involved in the case. Sun Life reasonably determined that Mr. DePardo could return to sedentary work within 4 weeks of the July 16, 2002 office visit, such that total disability was not established beyond August 11, 2002. Its decision was reasonable and supported by the substantial evidence in the Administrative Record.

The fact that Sun Life relied on the opinions of its medical consultants to determine that Mr. DePardo was not totally disabled after August 11, 2002 does not mean that its decision is arbitrary and capricious.[2] Gannon v. Metropolitan Life Insurance Co., 360 F.3d 211, 214 (1st Cir. 2004)(a non-examining physician's review of a claimant's file is reliable medical evidence); Brigham v. Sun Life of Canada, 183 F. Supp. 2d 427, 437 (D. Mass. 2002), affirmed 317 F. 3d 73 (1st Cir. 2003)(denial upheld based on medical consultants opinion); Lopes v. Metropolitan Life Ins. Co., 332 F.3d 6 (1st Cir. 2002)(reliance on medical consultants opinions justified although contradictory to treating physician); Doyle v. Paul Revere Life Ins. Co., 144 F. 3d 181, 184 (1st Cir. 1998)(although conflicting medical evidence, defendant's denial upheld where it

---

[2]    Sun Life's reliance on the reasoned opinions of its medical consultants is particularly reasonable and permissible here because Mr. DePardo refused to attend the cardiac IME Sun Life requested while it was reevaluating his claim.

relied on opinions of medical consultants); <u>Ivy v. Raytheon Employees Disability Trust</u>, 307

F.Supp.2d 302 (D. Mass 2004)(even in the face of conflicting medical evidence it is reasonable

for the claim administrator to rely on the conclusions of independent medical consultants rather

than the conclusions of treating physicians); <u>McLaughlin v. Prudential Life Insurance Company</u>

<u>of America</u>, 319 F.Supp.2d 115 (D. Mass. 2004)(because the medical director appropriately

found that plaintiff's prognosis as reflected in the medical records became progressively more

positive as time healed the effects of surgery, under the arbitrary and capricious standard there

was credible support in the record for defendant's decision).

The mere fact that Sun Life reached a decision contrary to the opinion of Mr. DePardo's

physician, when Sun Life based its decision on substantial evidence in the record, including the

opinions of its in-house medical reviewers, does not mandate a conclusion that the denial was

arbitrary.  <u>See</u> <u>Brigham</u>, 183 F. Supp. 2d at 437; <u>Chandler v. Raytheon Employees Disability</u>

<u>Trust</u>, 53 F. Supp. 2d 84, 91 (D. Mass. 1999)("The fact that contrary medical assessments by

[Mr. DePardo's] treating physicians exist does not" make reliance by a plan administrator on

medical assessments of its own doctor or medical review by another doctor, among other things,

in determining that he was not disabled from any occupation, arbitrary and capricious); <u>Terry</u>,

145 F. 3d at 41 (That there are contradictory opinions does not render a decision arbitrary and

capricious.  Administrator is charged with the duty to resolve disputes concerning claimant

eligibility.).

B.     Mr. DePardo Has Not Demonstrated That He Remained Totally
       Disabled after August 11, 2004.

Mr. DePardo claims that Sun Life's decision was arbitrary and capricious and that Sun

Life should have approved payment of total disability benefits beyond August 11, 2002.

Mr. DePardo bears the burden of proving that he is entitled to benefits beyond August 11, 2002.

See Brigham, 317 F.3d at 84-85; Terry v. Bayer, 145 F.3d 28, 34 (1st Cir. 1998). The evidence in the Administrative Record reveals that Mr. DePardo cannot sustain his burden of proof for each of the following reasons:

The Administrative Record reveals that when Mr. DePardo submitted his STD and LTD claim, his occupation involved sedentary work. Mr. DePardo confirmed that his occupation required him to manage "30 salesmen and recruiters in staffing services." (AR-0275). His employer confirmed that the physical requirements on Mr. DePardo's occupation required him to sit 6 to 8 hours a day. At most, Mr. DePardo may have to bend or reach above shoulder level. (AR-0290). Based on the information received from Mr. DePardo's employer, and the definition of sedentary work set forth in the Dictionary of Occupational Titles, Sun Life reasonably determined that Mr. DePardo's occupation qualified as sedentary work. (AR-0618). Although Mr. DePardo's lawyer during the appeals process attempted to analogize Mr. DePardo's occupation to that of a more demanding position (i.e., "supervisor") (AR-0614), nowhere in the Administrative Record does Mr. DePardo provide evidence that contradicts his employer's description of the sedentary nature of his occupation.

In the Administrative Record it is undisputed that by December 2001 when Mr. DePardo submitted his claim he had at least a 10-year history of coronary artery disease. However, despite receiving treatment for his coronary disease Mr. DePardo continued to work in his occupation. In support of his disability claim, Mr. DePardo submitted Dr. Guiney's Attending Physician Statement, which stated that Mr. DePardo was unable to work because of coronary disease, but also stated that Mr. DePardo had first experienced symptoms and received treatment for coronary disease in 1989/1990. (AR-0286, 0287). The Administrative Record reveals that Mr. DePardo had undergone previous coronary surgeries in 1990 and 1997 from which he

successfully recovered and continued to work. (AR-0399-0343). The Employer's Statement confirms that Mr. DePardo had been working in his occupation at TAC for 7 years before he submitted his 2002 LTD claim. (AR-0332). Thus, despite intermittent treatment for his coronary disease, including surgery, Mr. DePardo successfully recovered and returned to work in his occupation. Mr. DePardo provides no medical explanation as to why, in the past he has been able to return to his sedentary work following cardiac surgery, but is unable to do so after successful revascularization of his coronary disease in April 2002. To the contrary, the medical records of Dr. Guiney, the results of the stress test and the opinions of 4 medical consultants support a determination that Mr. DePardo could return to his sedentary occupation following the April 2002 surgery.

In support of his disability claim, Mr. DePardo also submitted opinion letters from his cardiologist, Dr. Guiney and his retired former primary care physician, Dr. Niceforo. As explained above, although Dr. Guiney opines that Mr. DePardo cannot perform his sedentary occupation he fails to explain the inconsistency between this opinion and 1) his July 16, 2002 office record where he states that Mr. DePardo is walking 20 minutes a day, has no angina, no ischemia, no dyspnea, and appeared to be stable but not fully recovered; and 2) the May 2003 stress test that reports normal exercise tolerance despite a reduced ejection fraction. Nowhere does Dr. Guiney explain why Mr. DePardo with the ability to walk 20 minutes and a normal exercise tolerance, is unable to work in an occupation that requires virtually no physical exertion.

Furthermore, according to the Administrative Record, Dr. Guiney made the decision that Mr. DePardo was never going to return to work, even before Mr. DePardo had his April 2002 surgery. When Dr. Guiney submitted the attending physician statement in connection with the LTD claim he stated that Mr. DePardo could never return to full time or part time work, despite

noting that Mr. DePardo could sit, stand, and drive 1-3 hours per day. (AR-0275). Dr. Guiney's

attending physician's statement follows on the heels of two office visits, in November and

December 2001, where Dr. Guiney and Mr. DePardo discussed his work and reached the

conclusion that Mr. DePardo would make plans to "retire possibly on a disability." (AR-0352).

The Administrative Record supports the reasonable conclusion that Dr. Guiney's initial opinion

that Mr. DePardo cannot return to work is a forgone conclusion reached to accommodate his

patient's wishes regardless of the medical findings and test results.

      Although Dr. Niceforo claims that stress precludes Mr. DePardo from performing his

occupation, Dr. Niceforo's records reveal that over the years Mr. DePardo on occasion,

complained about work-related stress.[3]  The records also state that on occasion, Mr. DePardo

appeared tense, anxious and depressed.  Yet at no time prior to his April 2001 retirement did

Dr. Niceforo advise Mr. DePardo that he should stop working.  Although Dr. Niceforo opines

that Mr. DePardo due to his "poor physical and mental health could not keep up with the tasks

and performance level expected of him at work," Dr. Niceforo concedes that he has not seen or

examined Mr. DePardo since April 2001, some 20 months prior to the date of his opinion letter.

Dr. Niceforo's opinion about Mr. DePardo's mental limitations is nothing more than speculation

gleaned from his review of medical records.  Mr. DePardo, although referred to a psychiatrist,

did not provide Sun Life with any proof that he had a diagnosis of depression, or that it, or any

other mental limitation impaired his ability to perform his occupation.  To the contrary, when

given the opportunity to be evaluated by an independent medical examiner, as Sun Life

requested in March 2002, Mr. DePardo refused to attend the IME.  His refusal put Sun Life in

the position of making a disability determination based on the opinions of physicians, medical

---

[3]    Stress alone does not render an insured with coronary disease totally disabled no matter how "nerve-racking" his occupation may be. <u>Leipzig v. AIG Life Ins. Co.</u>, 362 F.3d 406, 409 (7th Cir. 2004).

records and test results, and precluded Sun Life access to additional information regarding Mr. DePardo's ability to perform his occupation.

Mr. DePardo's failure to return to work in his occupation may very well be due to the significant reduction in income that he sustained in November 2001 when TAC's former President left the company. According to the Administrative Record, Mr. DePardo learned on November 1, 2001 that the new Interim President at TAC would no longer honor the arrangement where TAC's previous President paid Mr. DePardo a $12,000 monthly "bonus" in addition to his $85,000 annual salary. As of November 1, 2001, Mr. DePardo learned that with this decision by the Interim President, his income dropped from $229,000 a year, to $85,000. On November 12, 2001, soon after learning that his monthly "bonus" had been eliminated, Mr. DePardo reported to Dr. Guiney that he was "depressed and under great pressure at work" and they "spent a lot of time discussing his work situation…" (AR-0351). By the December 12, 2001 office visit, Dr. Guiney writes that Mr. DePardo will "make plans to retire, possibly on a disability." (AR-0352). Thus, while Mr. DePardo may have previously complained of stress on the job, it was never sufficient to make him stop working, until after his compensation was reduced. Mr. DePardo, based on the Administrative Record, has not sustained his burden of proving that he was disabled after August 11, 2002.

## II.    SUN LIFE PROPERLY CALCULATED THE LTD BENEFITS PAID TO MR. DEPARDO.

Pursuant to the Plan, the total disability benefit paid is 60% of an employee's Total Monthly Earnings. "Total Monthly Earnings" are defined as "your basic monthly earnings as reported by your Employer immediately before the first date your Total or Partial Disability begins…[and] does not include bonuses." Based on this provision and the information received

from TAC, Sun Life reasonably calculated Mr. DePardo's total disability benefit as 60% of his weekly salary of $1,634.62 or $980.77 per week .[4]

TAC submitted two Employer's Statements to Sun Life which identified that Mr. DePardo earned a weekly salary of $1,634.62 with no commissions and no bonuses. (AR-0332, 0289). Mr. DePardo contested TAC's failure to disclose his purported $12,000 per month "commission." (AR-0281). TAC reiterated to Sun Life "that as of November 1, 2001 Mr. DePardo's compensation consisted of a weekly salary of $1,634.62 only." (AR-0280). Mr. DePardo appealed this calculation on September 13, 2002 (AR-0598) and submitted documentation, including a pay stub dated December 19, 2001, reflecting $1,634.62 as regular pay, $132,000 in "bonus" and $12,500 in "executive bonus." (AR-0610). However, this pay stub did not reflect any "bonus" for the time period ending December 19, 2001.

The substantial evidence in the Administrative Record reveals that Mr. DePardo's employer reported that "immediately prior" to the date that Mr. DePardo's disability began Mr. DePardo's Basic Monthly Earnings were a weekly salary of $1,634.62 only. Mr. DePardo reported a first date of disability of December 15, 2001. (AR-0274). While Mr. DePardo may have previously earned a $12,000 monthly "bonus," that bonus was stopped as of November 1, 2001. Because the additional compensation was a "bonus" and, in any event, had been discontinued nearly six weeks prior to the first date his disability began, it was not part of Mr. DePardo's "Total Monthly Earnings" earned "immediately prior" to his first date of disability. Given the terms of the Plan, and information reported by the employer, Sun Life's

---

[4]    Sun Life paid Mr. DePardo 60% of his $1,636.62 weekly salary or $4,250.01 per month from March 2002 through July 14, 2002. According to the Social Security Administration records submitted by Mr. DePardo, he was entitled to monthly disability benefits from Social Security beginning in June 2002 in the amount of $1,652.00. (AR-0360). Under the terms of the Plan, this amount must be deducted from Mr. DePardo's Total Monthly Earnings when calculating his LTD benefit. (AR-0008). This was not done for the payments made to Mr. DePardo from June 1, 2002 through July 14, 2002. As a result, Mr. DePardo was overpaid for this time period in the amount of $2,422.94. (AR-0364). Consequently, when Sun Life approved Mr. DePardo's LTD claim through August 11, 2002 it did not pay him any additional benefit.

calculation of the amount of Mr. DePardo's disability benefit was reasonable and supported by the Administrative Record.

### III.    MR. DEPARDO IS NOT ENTITLED TO ANY ACCELERATED BENEFITS UNDER THE LIFE INSURANCE POLICY.

Mr. DePardo's claim that Sun Life has wrongfully and unreasonably withheld the cash value of this Accelerated Life benefit has no merit. (Complaint ¶32).

The Plan provides: "If all or part of an Employee's Life Insurance ceases or reduces due to:…termination of his employment…then the Employee may apply for an individual policy on his own life up to the amount that ceased."  However, "[w]ritten application must be made to Sun Life along with payment of the first premium, within the 31 day period (the 31 day conversion period) following the date the insurance ceases or reduces."  (AR-0658, 0659). An Employee may be entitled to waiver of the life insurance premium "[i]f Sun Life receives Notice and Proof of Claim that the Employee becomes Totally Disabled: . . . before his 60th birthday . . ." (AR-0023). Under the Plan, Sun Life will pay an Accelerated Benefit to the Employee at the Employee's request, if Sun Life receives satisfactory Certification that the Employee is "Totally and Permanently Disabled" and "a written request to Sun Life while the Employee's life insurance is in force…"(AR-0657).

Here, it is undisputed that Mr. DePardo's disability began after his 60th birthday. As a result he was not eligible for waiver of the life insurance premium. The undisputed evidence also establishes that Sun Life notified Mr. DePardo of his right to convert to an individual policy and Mr. DePardo took no action. On April 1, 2002, Sun Life notified TAC, with a copy to Mr. DePardo, that Mr. DePardo did not qualify for waiver of the life insurance premium under the Plan because his alleged disability began after age 60. Sun Life advised TAC that it had the option of continuing to pay Mr. DePardo's life premium for up to 12 months.  If TAC did not

continue making premium payments on behalf of Mr. DePardo, pursuant to the Plan, Mr. DePardo would no longer be insured under TAC's life insurance policy. If coverage terminated, Mr. DePardo had 31 days to covert to an individual policy. (AR-0268).

Upon inquiry from Mr. DePardo's lawyer Sun Life reiterated in a letter dated May 20, 2002 that Mr. DePardo should contact TAC directly to check on the status of his coverage. Sun Life enclosed a conversion package for Mr. DePardo in the event that his coverage had been terminated and told him to return the information in 31 days. (AR-0235).  Mr. DePardo did not return the conversion packet to Sun Life. He did not convert his group life insurance benefit to an individual policy. As a result, Mr. DePardo's coverage for life insurance terminated on the date TAC ceased making premium payments on his behalf. (AR-0676).

Because he did not convert to an individual policy Mr. DePardo has no life insurance coverage with Sun Life. Even if he had converted to an individual policy, he never submitted the written request to Sun Life for Accelerated Benefits while his life insurance is in force. Nor did he submit the required certification to show that he was Totally and Permanently Disabled. He did not satisfy the Plan provisions required to keep his life insurance in force or make a claim for the Accelerated Benefits. (AR-0657).

Lastly, at no time did Mr. DePardo raise any issue regarding or submit a claim for Accelerated Life Benefits during the administrative process.  As a result, he has not exhausted his administrative remedies with respect to this claim for Accelerated Benefits and it should be dismissed.  Rivera-Diaz v. American Airlines, Inc., 2000 U.S. App. LEXIS 18008 (1st Cir. 2000).

## CONCLUSION AND RELIEF REQUESTED

For the forgoing reasons, Sun Life's decision to deny benefits after August 11, 2002 and

its calculation of benefits paid was reasonable and supported by the substantial evidence in the

Administrative Record. Sun Life requests that this Court enter summary judgment on its behalf.

SUN LIFE OF CANADA

By its attorneys,


/s/ Kristina H. Allaire
Joan O. Vorster, Esq., BBO #550375
Kristina H. Allaire, Esq., BBO #646001
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: October 14, 2004

## CERTIFICATE OF SERVICE

I, Kristina H. Allaire, hereby certify that I have this day served a copy of the foregoing
document, by mailing a copy, first class mail, postage prepaid, to Nicholas S. Guerrera, Esq.,
Shaheen Guerrera & O'Leary, LLC, Jefferson Office Park, 820A Turnpike Street, North
Andover, MA 01845 and Robert Shea, Esq., Morse, Barnes-Brown & Pendleton, P.C., Reservoir
Place, 1601 Trapelo Road, Waltham, Massachusetts 02451.


/s/ Kristina H. Allaire
Kristina H. Allaire, Esq.

Dated: October 14, 2004