UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM A. DEPARDO,<br>    Plaintiff<br><br>V.<br><br>MFS/SUN LIFE FINANCIAL<br>DISTRIBUTORS, INC. d/b/a SUN LIFE OF<br>CANADA and TAC WORLDWIDE<br>COMPANIES,<br>    Defendants | CIVIL ACTION NO. 04-10248-DPW |

## SUN LIFE OF CANADA'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

In support of its Motion for Summary Judgment and pursuant to Local Rule 56.1, the defendant, Sun Life Assurance Company of Canada ("Sun Life"), submits the following concise statement of the material facts of record as to which it contends there is no genuine issue to be tried.

1.    In December 2001, Mr. DePardo was employed by TAC Worldwide Companies ("TAC") as a Vice President of Corporate Project Management. Administrative Record page: DePardo 0332.[1]

2.    At the time he filed his claim, Mr. DePardo was 63 years old and covered under TAC's employee welfare benefit plan. (the "Plan"). The Plan was funded by a group policy issued by Sun Life to TAC. The Plan provided for short-term disability ("STD") benefits, long-term disability ("LTD") benefits and life insurance benefits.

---

[1] All references to the Administrative Record will be by AR-0XXX and are contained in the volumes of the Administrative Record which were filed with the Court on September 30, 2004.

**Short Term Disability Claim.**

3. Pursuant to the Plan, STD benefits are paid for a maximum of 13 weeks if an employee needs to be out of work due to illness or accident. (AR-0821). Although TAC self-funded the STD benefit, Sun Life provided medical review and duration recommendations for sick leave or short-term disability claims. (AR-0814).

4. On December 26, 2001, TAC submitted a SunAdvisor Employer's Statement requesting sick leave advice regarding Mr. DePardo. (AR-0332).

5. The Attending Physician's Statement ("APS") submitted by Mr. DePardo's cardiologist, Dr. Timothy E. Guiney, listed a diagnosis of "coronary heart disease" and categorized Mr. DePardo's physical impairments as "Class 5 – limitation of functional capacity; incapable of minimal (*sedentary) activity." (AR-0336). Dr. Guiney stated that Mr. DePardo was unable to perform all of the duties of his occupation on a full-time basis as of December 17, 2001. (AR-0336).

6. Sun Life recommended that TAC approve Mr. DePardo's STD claim from December 17, 2001 through March 17, 2002, the policy maximum (i.e., thirteen weeks). (AR-0329).

**Long Term Disability Claim.**

7. Under the Plan, total disability for long-term disability benefits means:

"The Employee, because of Injury or Sickness, is unable to perform all the material and substantial duties of his own occupation." (AR-0752).

8. According to the Plan, Sun Life must receive Notice and Proof of Claim (whether a claim for life or LTD benefits) prior to any payment under the Policy. (AR-0684, 0739). Proof of Claim under the Policy "must be satisfactory to Sun Life." (AR-0685, 0740).

9. In February 2002, at the end of his STD period, Mr. DePardo submitted a claim for LTD benefits to Sun Life. (AR-0274). Mr. DePardo claimed to be totally disabled as a result of "coronary heart disease." He informed Sun Life that he first noticed symptoms of his condition in 1989-1990, but continued to work until December 14, 2001. (AR-0274).

10. Dr. Guiney's Attending Physician Statement submitted in connection with his LTD claim describes Mr. DePardo's physical limitations as "Class 5 limitation of functional capacity; incapable of minimal (*sedentary) activity" due to coronary heart disease. Although Dr. Guiney stated that Mr. DePardo could "never" return to full-time or part-time work, he determined that Mr. DePardo could sit, stand, and drive 1 to 3 hours per day. (AR-0286).

11. In his Employee Statement Mr. DePardo identified the duties of his occupation to be that he "manage[d] 30 salesmen and recruiters in staffing services." (AR-0275).

12. According to the Employer's Statement, TAC identified that as Vice President of Corporate Project Management, Mr. DePardo oversaw and directed the SMD Business Unit operations. (AR-0290). Mr. DePardo was also responsible for answering customer complaints, working closely with his co-workers and for the overall performance of his department. He supervised 20 to 25 employees. TAC identified that Mr. DePardo's occupation required him to sit 6 to 8 hours a day, stand or walk 0 or 1 hours and drive 0 to 2 hours a day. He could change any of these positions at will. Occasionally, Mr. DePardo had to bend or reach above shoulder level. He was not required to lift, climb, kneel, balance, push/pull, or crawl/crouch. (AR-0290).

13. The Dictionary of Occupational Titles (DOT) published by the Department of Labor, defines sedentary work as

> "Exerting 10 pounds of force occasionally, (Occasionally: activity or condition exists up to one-third of the time) and/or a negligible amount of force frequently (frequently: activity or condition exists from one-third to two-thirds of the time) to lift, carry, push, pull, or otherwise move objects, including the human body.

> Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." (AR-0618).

Based upon this definition and the description of Mr. DePardo's occupation provided by his employer, Sun Life determined that Mr. DePardo's occupation was sedentary work. (AR-0618).

14. Upon receipt of Mr. DePardo's claim, Sun Life reviewed and evaluated his medical records from his treating cardiologist, Dr. Guiney. (AR-0335-0352). Those records revealed that Mr. DePardo had been treated for coronary artery disease for 10 years prior to his claim for disability. (AR-0336). In February 1990, Mr. DePardo underwent a cardiac catheterization with selective coronary angiograph. (AR-0339). In March 1990, he had a double coronary by-pass. (AR-0340). On April 25, 1997, Mr. DePardo again had an angioplasty and quadruple coronary stenting. (AR-0340). At the time of the angioplasty, there was a 99% stenosis of his left main coronary artery. As a result, he had four stents inserted. He was discharged 2 days later. (AR-0342). On June 4, 1997, Dr. Guiney noted in his follow up visit that he was walking on the treadmill 2 times a day and seemed to be doing "quite well." (AR-0343). On January 29, 1999, Mr. DePardo had a stress test. At that time his maximum workload was 7 mets and he began experiencing chest pain after 3:57 minutes of exercise. (AR-0345). The stress test reported that Mr. DePardo had "a normal exercise capacity." (AR-0346).

15. Despite intermittent cardiac problems, Mr. DePardo continued to perform his occupation. On the Employer's Statement TAC informed Sun Life that Mr. DePardo had been working in his occupation for seven years. (AR-0289).

16. On May 14, 2001, Dr. Guiney noted that Mr. DePardo's angina was under "reasonably good control;" although "slow to get started in the morning, once he is out of the

shower he feels energetic throughout the day;" a "detailed review of systems was otherwise non-contributory;" and he was "doing well at this point." (AR-0349).

17. On November 12, 2001, Dr. Guiney saw Mr. DePardo and stated in his office chart that Mr. DePardo was in "rather tough shape," "depressed and under great pressure at work." (AR-0350). He was having more "nocturnal episodes of angina", which were worse if he eats in the evening. Mr. DePardo and Dr. Guiney "spent a lot of time discussing his work situation, his love for his new grandson, and his feeling that things are generally falling apart and that his own death is imminent." Dr. Guiney noted Mr. DePardo was "tearful on examination." Dr. Guiney made plans to "consider getting him in for another catheter study and further attempts at revascularization." (AR-0351).

18. On December 12, 2001, Dr. Guiney, after examining Mr. DePardo noted that

> [h]e continues to be anxious and depressed and fearful about his prospects for survival. He is having a lot of angina pectoris at rest and I think he should come in for coronary angiogram to see if there is anything else that can be done. The examination is unchanged as is his electrocardiogram. Many of his anxieties that do not revolve around his cardiac situation have to do with his job. He feels that the stresses, even if self-imposed are contributing to the frequency and severity of his angina pectoris. That being the case, I think he should retire. We left it that he will speak to the human resources people at work and the owner of his company and make plans to retire, possibly on a disability. . ." (AR-0352).

19. By letter dated March 26, 2002, Sun Life informed Mr. DePardo that he did not qualify for LTD benefits because

> "[t]he information in our file indicates that Mr. DePardo stopped working and planned to retire per Dr. Guiney's order. Two days following the December 12, 2001 office visit, Mr. DePardo stopped working. Since we cannot verify that Mr. DePardo stopped working due to an Injury or Sickness as defined by the Policy, we cannot assess whether or not he meets the definition of Total Disability, therefore no benefits are payable on the claim. In addition, based on the medical information provided by Dr. Guiney, it appears that Mr. DePardo worked with his coronary heart disease for some time with no complications that prevented him from performing the duties of his own occupation. Since the medical information in the file does not indicate that a change or complication in Mr. DePardo's medical condition occurred that would have prevented him from

performing the Material and Substantial Duties of his own occupation as of December 14, 2001, we are unable to approve payment of benefits on the claim...

(AR-0271).

20. On May 14, 2002, Mr. DePardo appealed Sun Life's denial of LTD benefits (AR-0252). He later informed Sun Life that on April 30, 2002, he had undergone a coronary artery by-pass graft surgery. (AR-0259).

21. On May 22, 2002, Sun Life requested additional medical records from January 2000 going forward in order to reevaluate his claim. (AR-0237).

22. On June 18, 2002, Sun Life reminded Mr. DePardo of the need for updated medical records. (AR-0231).

23. On August 3, 2002, Mr. DePardo submitted additional medical records in support of his claim, including records from his by-pass surgery. (AR-0056, 0225).

24. As part of Sun Life's evaluation of Mr. DePardo's appeal, William Watson, M.D., a cardiothoracic surgeon, reviewed the claim file and medical records. (AR-0628). Dr. Watson found that based on the medical records, the surgery on April 30, 2002 was successful and that Mr. DePardo "should be expected to return to normal activity levels, subject to any postoperative complications…It appears the angina pectoris has been ameliorated and should no longer be a cause of disability from his previous occupation." (AR-0638, 0639). Dr. Watson concluded that it was reasonable to assume that Mr. DePardo "would be unable to perform the duties of his sedentary occupation from December 15, 2001 to April 30, 2002, the date of the surgical intervention. Any further disability would be based on his postoperative course which one would normally expect to be 8-10 weeks because of the physical limitations from the surgical intervention." (AR-0639).

25.     By letter dated August 28, 2002, Sun Life reversed its previous determination and notified Mr. DePardo that "satisfactory proof of continued disability has been provided for a limited period of time." Sun Life reopened Mr. DePardo's claim and paid total disability benefits "for the period of December 15, 2001 (the first day of disability) through July 14, 2002 (10 weeks from date of surgery)." However, Sun Life denied benefits beyond July 14, 2002 "because documentation in the file did not support Total Disability from his own occupation…" (AR-0616). After explaining the reasons for its appeal decision, Sun Life informed Mr. DePardo that "[a]ll administrative remedies have been exhausted and no additional information will be reviewed." (AR-0619).

26.     By letter dated September 12, 2002, Mr. DePardo nevertheless appealed Sun Life's decision that Total Disability had not been established beyond July 14, 2002. (AR-0598).

27.     In December 2002, Mr. DePardo submitted additional medical records. (AR-0474-0579).

28.     Sun Life agreed to accept the additional records and review the medical aspects of Mr. DePardo's disability claim. (AR-0460).

29.     The records received included additional office records from Dr. Guiney. On July 16, 2002, Dr. Guiney noted Mr. DePardo "is making progress but is coming along slowly with his walking. He walks about 20 minutes each day and I would like him to try to increase this. His dyspena is no longer present since he has not re-accumulated his pleural effusion. There does not appear to be any angina pectoris, although he still has some substernal discomfort and tenderness." Dr. Guiney stated that Mr. DePardo "is doing better but is not completely back to normal." (AR-0577).

30. In his office note of November 15, 2002, Dr. Guiney noted that Mr. DePardo appeared depressed and that he had referred him to a psychiatrist. (AR-0578). He also noted that up until he sprained his ankle, Mr. DePardo had been walking for exercise at Dr. Guiney's request. Mr. DePardo complained of aches and pains in and about the chest, but none appeared anginal. (AR-0578). Dr. Guiney stated that in his view Mr. DePardo "should not return to work. He has had two major heart operations, is profoundly depressed and now has an incisional hernia which itself may require further surgery. He should be viewed as totally and permanently disabled." (AR-0579).

31. Mr. DePardo also submitted a report from his retired former primary care physician, Dr. John Niceforo, who had not seen Mr. DePardo as a patient since April 2001. Dr. Niceforo opined that Mr. DePardo was totally disabled from performing his occupation or any occupation, in part because of the stress associated with his occupation. (AR-0571, 0572).

32. Upon receipt of this additional medical information Sun Life arranged for further medical review. Upon review of the claim file, Marc Friedman, M.D., board certified in internal medicine and cardiovascular disease, determined that it was possible that Mr. DePardo was experiencing a slow recovery. Dr. Friedman recommended a stress test and follow-up evaluation to determine Mr. DePardo's physical limitations. (AR-0447).

33. As a result, Sun Life scheduled an Independent Medical Examination ("IME"), with a cardiologist, including a stress test, to ensure that it had a full understanding of Mr. DePardo's medical condition. (AR-0429). Sun Life notified Mr. DePardo that under the Plan, no LTD benefits are payable for any period that the Employee fails to submit to a medical examination. (AR-00430, 0039).

34.     Mr. DePardo refused to appear for the cardiac IME. He did agree to have a stress test, but only if it was administered by his own physician. (AR-0427).

35.     On May 30, 2003, Mr. DePardo submitted the results of the stress test to Sun Life. (AR-0418-0422).  The stress test concluded that Mr. DePardo "has normal exercise capacity (METS achieved = 6)…There is no evidence of ischemia…The calculated LVEF (ejection fraction) is 24% with hypokinesis."  (AR-0421, 0422).

36.     Dr. Guiney also submitted a letter dated May 29, 2003 in which he sated that "by any reasonable standard a man with an ejection fraction of 24 percent, diabetes mellitus, and hypertension cannot possibly do any of the jobs for which he in the past has had training or experience.  I have told him that he must not return to work, particularly the type of work he did at his most recent employment.  I consider him totally and permanently disabled by virtue of his heart disease …" (AR-0420).

37.     On June 3, 2003, Mr. DePardo's claim file, including the newly submitted stress test and letter from Dr. Guiney, were reviewed by family practitioner, Dr. Richard Herman who recommended that Dr. Sweeney, a cardiologist, review the medical information in order to determine whether "the ejection fraction which might produce dyspnea under certain situations, is compatible with work in a sedentary occupation." (AR-0398).

38.     Dr. Sweeney determined that despite an ejection fraction of 24%, Mr. DePardo was "certainly capable, from a cardiac viewpoint, to perform the duties outlined in his job description." (AR-0388, 0390).  "The exercise duration reported on the recent study (stress test) corresponds to a workload of 6 mets.  Sedentary work generally requires 3 or less mets, light carpentry and auto repair or stocking light objects on shelves 3-5 mets and activities such as shoveling dirt, exterior carpentry and sawing wood require 5-7 mets.  The job description of

March 7, 2002 indicates a sedentary occupation. The physical requirements outlined do not exceed the exercise capacity demonstrated during the stress test of May 1, 2003. Based on these facts there is no cardiac basis for disability. The claimant's other medical problems including depression, obesity, diabetes, hypertension and hyperlipidemia were all present at the time of the stress test and throughout his entire post operative course." (AR-0389). Dr. Sweeney opined that he would expect the claimant to return to a sedentary occupation within two to four weeks of his July 16, 2002 visit with Dr. Guiney, during which Dr. Guiney noted that Mr. DePardo was stable but not yet completely normal. (AR-0390).

39. By letter dated June 27, 2003, Sun Life notified Mr. DePardo that it would reopen his claim and pay total disability benefits for the limited period of July 15, 2002 through August 11, 2002 (i.e., four weeks after his visit with Dr. Guiney), but that it would not pay any benefits after that date. (AR-0385-0386).

**Calculation of Benefits.**

40. Under the Plan, LTD benefits for total disability are the lesser of (a) 60% of the employees Total Monthly Earnings, or (b) $12,500 minus Other Income Benefits. (AR-0008, 0034).

41. Total Monthly Earnings means "the Employee's basic monthly earnings as reported by the Employer immediately prior to the first date Total or Partial Disability begins. Total Monthly Earnings does include commissions…but does not include bonuses, overtime pay or any other extra compensation." (AR-0697).

42. According to the Employer's Statement submitted for both Mr. DePardo's STD and LTD claims, TAC paid Mr. DePardo a weekly salary of $1,634.62. Mr. DePardo did not receive commissions or bonuses. (AR-0332, 0289).

43.     In a letter dated March 13, 2002 to Sun Life, Mr. DePardo claimed that TAC failed to include salary information on the Employer's Statement. Mr. DePardo claimed that in addition to the salary disclosed by TAC, he received a monthly commission in the amount of $12,000.00. (AR-0281).

44.     TAC responded with a letter dated March 19, 2002 where it informed Sun Life that it had not omitted salary information because "[a]s of November 1, 2001, Mr. DePardo's compensation consisted of a weekly salary of $1634.62 only." (AR-0280).

45.     Accompanying Mr. DePardo's claim for benefits was a Non-Payment of Wage Complaint Form, which he filed with the Massachusetts Attorney General. (AR-0292). Mr. DePardo claimed to have had an agreement with TAC's prior President, Michael Iandoli, whereby Mr. DePardo was paid $12,000.00 as a flat monthly "commission." (AR-0293). In November 2001, Mr. Iandoli left the company. TAC's Interim President, Salvatore Balsimo, informed Mr. DePardo that he was unaware of the arrangement Mr. DePardo had with the previous President and refused to pay it. (AR-0294). As a result of the position taken by TAC's Interim President, Mr. DePardo's compensation as of November 2001, fell from $225,000 per year to $85,000 per year. (AR-0294).

46.     In September 2002, Sun Life issued a LTD benefit check in the amount of $17,141.71, which represented 60% of Mr. DePardo's weekly salary ($1,634.62) for the period from March 15, 2002 through July 14, 2002 (approximately 17 1/2 weeks). (AR-0588).

47.     In September 2002, Mr. DePardo again claimed that his salary had been miscalculated and should include the $12,000.00 monthly "commission" payments. Mr. DePardo submitted a December 2001 pay stub, which reflects a base salary of $81,404.10, a year-to-date "bonus" in the amount of $132,000.00 and an "executive bonus" of $12,500.00.

(AR-0610). However, this pay stub did not reflect a bonus payment for the period ending December 15, 2001. (AR-0610).

48.     In response to Mr. DePardo's allegations, Sun Life notified Mr. DePardo on November 1, 2002 that it had properly calculated his LTD benefits. Sun Life informed Mr. DePardo that under the Plan "Total Monthly Earnings" are defined as "your basic monthly earnings as reported by your Employer immediately before the first date of your Total or Partial Disability begins…[and] does not include bonuses." (AR-0587). Sun Life further informed Mr. DePardo that: (1) TAC reported (and subsequently confirmed) that Mr. DePardo's weekly salary, immediately before his disability was $1,634.62; and (2) the extra compensation Mr. DePardo referred to was a bonus, which is excluded from consideration. (AR-0587, 0588).

49.     In a subsequent telephone conversation in November 2002, Mr. DePardo's attorney informed Sun Life that the New Hampshire labor board had denied Mr. DePardo's wage claim on this issue. (AR-0584).

50.     The Plan provides that if an Employee is Totally Disabled, the Net Monthly Benefit will be 60% of the Employee's Total Monthly Earnings minus benefits received from Social Security. (AR-0034-0037). If after notifying Sun Life of the amount of Social Security Benefits the employee has been overpaid, "the Employee must reimburse Sun Life the amount of the overpayment within 30 days of the award. Sun Life has the option to reduce or eliminate future LTD benefit payments instead of requiring reimbursement in a lump sum." (AR-0038).

51.     On February 27, 2002, Mr. DePardo returned a signed Reimbursement Agreement stating that he understood Sun Life had the right to subtract the amount of Social Security benefits from his monthly benefit check. (AR-0276).

52. In June 2002, Mr. DePardo began receiving Social Security Disability Benefits in the amount of $1,652.00 per month. (AR-0366). In January 2003, he received a cost of living increase and began receiving $1,675.00 per month. (AR-0359).

53. Sun Life paid benefits from June 1, 2002 through July 14, 2002 without deducting the amount Mr. DePardo received from Social Security. This resulted in an overpayment of $2,422.94. (AR-0364).

54. Sun Life calculated the total benefit due for July 15, 2002 through August 11, 2002 at $2,338.21. Because Sun Life's overpayment was in excess of the benefits due for the period of July 15, 2002 to August 11, 2002, Sun Life did not make a payment to Mr. DePardo for this period. (AR-0364).

**Accelerated Benefits Under Life Insurance Claim.**

55. The Plan also provides group life insurance. As part of that coverage:

"If all or part of an Employee's Life Insurance ceases or reduces due to:…termination of his employment…then the Employee may apply for an individual policy on his own life up to the amount that ceased." "The Employee will be issued an individual policy without Evidence of Insurability." However, "[w]ritten application must be made to Sun Life along with payment of the first premium, within the 31 day period (the 31 day conversion period) following the date the insurance ceases or reduces." (AR-0658, 0659).

56. Under the Plan, Sun Life will pay an Accelerated Benefit to the Employee at the Employee's request, if Sun Life receives satisfactory Certification that the Employee is "Totally and Permanently Disabled." (AR-0657) and "a written request to Sun Life while the Employee's life insurance is in force…"(AR-0657).

57. "Total and Permanent Disability" or "Totally and Permanently Disabled" for the purposes of eligibility under the Accelerated Benefit, means one or more of the following qualifying events:

> 1. An Employee's medical condition that includes the following specifically named or described conditions. The Physician must certify that the Employee's condition requires extraordinary medical intervention without which the Employee will die. These medical conditions include:…(c) coronary artery disease that results in an acute infarction or requiring surgery.
>
> or
>
> 2. An Employee's Sickness or physical condition that is Certified by a Physician to be reasonably expected to result in death within 24 months or less.

(AR-0645, 0646).

58. Pursuant to the Plan an Employee may be entitled to waiver of the life insurance premium "[i]f Sun Life receives Notice and Proof of Claim that the Employee becomes Totally Disabled: . . . before his 60th birthday . . ." (AR-0023).

59. On April 1, 2002, Sun Life notified TAC's Director of Human Resources, with a copy to Mr. DePardo, that regardless of the outcome of his disability claim, Mr. DePardo did not qualify for a waiver of the life insurance premium under the Plan because his alleged disability began after age 60. Sun Life advised TAC and Mr. DePardo that TAC had the option of continuing Mr. DePardo's premium for up to 12 months. If coverage terminated, Mr. DePardo had 31 days to convert to an individual policy. (AR-0268).

60. On April 5, 2002, TAC notified Mr. DePardo that based on his doctor's prognosis, TAC had decided to treat Mr. DePardo's Employment as having been terminated. (AR-0806).

61. Upon inquiry from Mr. DePardo's attorney, Sun Life reiterated in a letter dated May 20, 2002 that TAC could continue to pay the life insurance premiums, but that Mr. DePardo should contact TAC directly and check on the status of his coverage. (AR-0235). Sun Life also enclosed a conversion package for Mr. DePardo in the event his coverage had been terminated and told him to return the information within 31 days. (AR-0235).

62. Mr. DePardo did not complete and return the conversion package to Sun Life.

63. Mr. DePardo's life insurance coverage terminated as of the date TAC stopped making the premium payments. (AR-0676).

64. At no point during the pendency of this claim or the appeals process did Mr. DePardo submit a written request for accelerated benefits under the life policy, or a certification that he was Totally and Permanently Disabled.

SUN LIFE OF CANADA

By its attorneys,

/s/ Kristina H. Allaire
Joan O. Vorster, Esq., BBO #550375
Kristina H. Allaire, Esq., BBO #646001
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: October 14, 2004

## CERTIFICATE OF SERVICE

I, Kristina H. Allaire, hereby certify that I have this day served a copy of the foregoing document, by mailing a copy, first class mail, postage prepaid, to Nicholas S. Guerrera, Esq., Shaheen Guerrera & O'Leary, LLC, Jefferson Office Park, 820A Turnpike Street, North Andover, MA 01845 and Robert Shea, Esq., Morse, Barnes-Brown & Pendleton, P.C., Reservoir Place, 1601 Trapelo Road, Waltham, Massachusetts 02451.

/s/ Kristina H. Allaire
Kristina H. Allaire, Esq.

Dated: October 14, 2004